IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| **IBRAHIM DIA** | **CIVIL ACTION** |
| v. | |
| **JL JAMISON, *et al*.** | **No. 26-1669** |

**Henry, J.**                                                                                                          **April 30, 2026**

**MEMORANDUM**

The question in this case is basically what process is due to a person who has been released for a very long time with a final order of removal when the government decides to act on that order. The parties agree that this question is a legal determination, the underlying facts having been agreed to by stipulation. In summary, Ibrahim Dia is a Malian man who arrived in the United States legally in 2000. When he overstayed his visa, he was permitted an order of voluntary departure, but he never left. Instead, he remained in the United States over the 26 years since, marrying a lawful permanent resident and fathering four minor U.S. citizen children for whom he is the major supporter. Pet'n ¶ 16.[1]

Dia reported as required to the Immigration and Customs Enforcement (ICE) field office on March 12, 2026, at which time he was arrested and served a notice of revocation. Opp. 6. The notice listed only one reason for revocation: "It is appropriate to enforce the removal order entered against you as ICE has the ability and means to effectuate your removal." Notice of Revocation of Release 2 (ECF 3-3). The form also noticed Dia of an informal interview on March 16, 2026, at

---

[1] During his presence here, he was also convicted of a theft misdemeanor, *id*. ¶ 17, and additional misdemeanor charges, including tampering and unsworn falsification, opp. 6.

which he would be given "an opportunity to respond to the reasons for this revocation." *Id.* at 2. Also on March 12, an officer prepared an Order of Supervision Revocation Worksheet, listing no violations but only that "Per ICE Removal and Management Division SLRRFF [Significant Likelihood of Removal in the Reasonably Foreseeable Future] is established for all citizens of Mali with an identity document. Copy of subject's Mali Passport is in file." ECF 3-3. After the official signed the worksheet at 2:34 p.m., a supervising officer concurred, noting that there were "no applicatons [*sic*], appeals, peitions [*sic*] or waivers pending" and signing off at 2:37 p.m.; the Assistant Field Office Director concurred with a brief note about health concerns being under control at 2:50 p.m.; and the Deputy Field Office Director summarized the previous reasons and signed off at 3:05 p.m. *Id.* Respondents provided a copy of a form providing Dia's oral responses at the informal interview four days later, which include his having been under supervision for more than a decade, his being the caretaker for his citizen children and very soon-to-be citizen wife, his long presence in the United States, his unfamiliarity with his homeland, and the better healthcare he can expect here. Alien Informal Interview Upon Revocation of Order of Supervision (ECF 7-1). The form indicates that Dia provided a written statement, but no such statement is included. *Id.*

Dia asks the Court to order his immediate release and a declaration that his detention is unlawful. Pet'n 15. He relies on constitutional arguments under the Due Process Clause, both substantive and procedural; administrative procedure based on the agency action being contrary to law, arbitrary and capricious, and beyond agency authorization; and a direct ultra vires claim. Pet'n ¶¶ 41–81. The focus of all these concerns is the recent decision by immigration authorities to revoke Dia's order of supervision, upon which they arrested and detained him despite his very plausible arguments that he is neither a flight risk nor a danger to the community, and his suggestion that he is not going to be removed to Mali any time soon.

The Immigration and Nationality Act addresses detention of those with a final order of removal. 8 U.S.C. § 1231. Revocation of an order of supervision is addressed under the regulations by 8 C.F.R. § 241.4(*l*), which addresses revocation for violation of supervision conditions or by discretion of the Executive Associate Commissioner (EAC). The reasons for discretionary revocation given are "(i) The purposes of release have been served; (ii) The alien violates any condition of release; (iii) It is appropriate to enforce a removal order or to commence removal proceedings against an alien; or (iv) The conduct of the alien, or any other circumstance, indicates that release would no longer be appropriate." *Id.* § 241.4(*l*)(2). When supervision is revoked, a review is done involving an interview with the new detainee "normal[ly] . . . within approximately three months after release is revoked." *Id.* § 241.4(*l*)(3); *see also generally id*. § 241.4.

Where "revocation is in the public interest and circumstances do not reasonably permit referral of the case to the [EAC]," a "district director may also revoke release." *Id.* § 241.4(*l*)(2). By "district director," the regulation refers to "any person or persons (including a committee) designated in writing by the [EAC], the Director of the Detention and Removal Field Office, or the district director to exercise powers under this section." *Id.* § 241.4(c)(4).

This Court has held recently that when ICE revokes an order of supervision pursuant to discretionary authority under 241.4(*l*)(2), "redetention under Section 241.1 requires notice and an informal interview." *Martinez v. Jamison*, 2026 WL 700335 at *3 (E.D. Pa. Mar. 12, 2026) (quoting *Zhu v. Genalo*, 798 F. Supp. 3d 400, 412 (S.D.N.Y. 2025)). In that case, we described the process that was given as "haphazard, frenzied, with a make-it-up-as-we-go feel to it, leaving others to backfill whatever was missed after the action had already been taken." *Id.* at *4. Yet the concerns we had there are not present here: We found a violation where Martinez was not given a notice of his revocation and its reasons at arrest, had no record as an "immigration violator," was served

with an un-timestamped form, and the Acting Field Office Director's signature lacked a timestamp. Finally, we found the law to require an informal interview promptly after detention, one which ICE declined to afford in that case. *Id.* at *5. To the contrary, Dia appears to have been served a prompt notice of his revocation upon arrest, one that was not obviously improper, and afforded an informal interview at which his concerns were recorded.[2]

Dia also challenged the authority of the Acting Field Office Director to revoke the order of supervision. Reviewing a similar challenge where an order delegating authority was entered into evidence, another court has ruled that this issue alone was sufficient to secure release. *Ceesay v. Kurzdorfer*, 781 F.Supp. 3d 137, 162 (W.D.N.Y. 2025) (order did not explicitly delegate the authority to revoke to an assistant field office director). As the court in *Ceesay* noted, not only was the proffered delegation facially insufficient to reach the authority to revoke, but also "there is no caselaw supporting the validity of such a delegation order."

Dia cited *Ceesay* in his petition, but the government's response hardly contends with that case or its reasoning. Instead, the response relies on 8 C.F.R. § 1.2, a definitions regulation that offers the following definition for "Director or district director":

> On or after March 1, 2003, pursuant to delegation from the Secretary of Homeland Security or any successive re-delegation, the terms mean, to the extent that authority has been delegated to such official: asylum office director; director, field operations; district director for interior enforcement; district director for services; field office director; service center director; or special agent in charge. The terms also mean such other official, including an official in an acting capacity, within U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, U.S. Immigration and Customs Enforcement, or other component of the Department of Homeland Security who is delegated the function or authority above for a particular geographic district, region, or area.

---

[2] Notably, *Martinez* came down the day of Dia's arrest. The attorney appearing for Martinez now appears for Dia here.

Respondents summarize this definition as "defining 'district director' after March 2003 to mean, among other roles, 'field office director,'" opp. 14, but that fails to address the requirement under § 1.2 for a delegation of such authority *to that official*. Although it is plausible that the fact of a written delegation could be a matter to which the parties would have stipulated, the respondents did not include such a fact, and no evidence was provided.[3]

In short, the order to revoke Dia's supervision issued from multiple officials who were addressing proper concerns, but it did not issue from anyone the respondents have shown to have authority to do so—even where that authority was challenged by Dia in his petition. I join *Ceesay*'s analysis: Under the governing regulation, the order was issued *ultra vires*; plainly, such an order cannot withstand scrutiny under statutory or constitutional process guarantees.[4] Under the circumstances, I will issue an order granting immediate release and enjoining for a short period Dia's rearrest.

---

[3] The respondents offered no suggestion as to why circumstances did not "reasonably permit" referral to the EAC, much less serve the public interest. *id*. § 241.4(*l*)(2), other than by suggesting that "referral to the EAC was not reasonable in light of ICE Headquarters' concurrence regarding the likelihood of his removal in the first instance," Opp. 15. I do not reach the question of whether information about the decisions that circumstances do not permit referral and that the revocation is in the public interest need be produced, or what other process requirements might attach thereto.

[4] Respondents do not argue that the matter is not justiciable or that the Court lacks jurisdiction.